Good morning ladies and gentlemen. First case for argument, United States v. McMillian. Mr. Henderson. Good morning, Your Honor. May it please the Court. There are two main attacks on the judgment below, one to the conviction on four of the seven counts, and one on the sentencing errors that occurred. I'm going to focus primarily on the sort of federalism concerns that I identified in the brief as to the convictions, and then on the ex post facto violation that happened at sentencing. This statute is fairly recent in terms of federal law. It was enacted in 2000, and it intrudes upon an area of traditional state authority, local criminal activity. And when Congress enacts a law that does such a thing, the Supreme Court has just told us last term that we need a clear indication from Congress that it actually intends to do so. So as a means of clarifying our argument, this is not an argument that this is somehow unconstitutional or beyond the power of Congress to enact. The argument is that Congress enacted a certain law that does not reach as far into local criminal activity as the government seems to think it does. You find that in the statutory language. The language requires a mental state that the person knows that another person will be caused to engage in a commercial sex act. The language isn't terribly clear because it's written in the passive voice, but what it appears, comparing that to, say, the state of Wisconsin statute, is that's the federal government saying, this is not just to reach prostitution generally. This is not a general anti-pimping statute. This is a statute that really is going after the evils of what Congress called a form of modern slavery. This is going after forced prostitution, prostitution against the will of the prostitutes. We cited to a law review article, which I think gives a good explanation of what's in the congressional record, and we've cited to the congressional record as well, and the record is replete with stories of what Congress really intended to target, and that is luring women in, promising them, come to this state, come to this country. We'll get you a good job, good legitimate job. The women show up, and they're forced to become prostitutes. You see the stories where if they decide to run or flee, their passports are taken from them. They'll be subject to... Where is, in your view, the limit of the congressional intent? I gather you think it covers international matters. Does it cover interstate matters? Absolutely. Any intrastate matters? Absolutely. Not any intrastate matters. Where's the line? The line is, I think, a voluntariness line, and that's what you see in the language and what you see in the congressional record. With respect to adults, that's what you see? I think with respect to both, because for both adults and minors, there has to be something that causes them to engage in a commercial sex act. Nice. Now, Congress doesn't tell us exactly what that is. Well, isn't the same thing alleged here that would apply to people in other countries? That is, a nicer lifestyle, all the types of things we're talking about here, doesn't apply to both the rationale and the reason for getting into prostitution. Right. And so the difference is whether that's a choice that you make or whether it's forced upon you. So, for example, in Nevada, people decide to become prostitutes. Now, in the state of Wisconsin, that's illegal. But what you see in this record is there's not this sort of deception. It's not Mr. McMillan saying, oh, come be with me, I'm an aspiring rap star, and you can just be a groupie. He's very explicit with each of them, and he walks them through the steps, here's what's going to happen. And they all understood, because he's a pimp, he's an aspiring rap star, that if they want to be with him, then that's the people he associates with. Well, did it start out that way? With Jessica, that was the first one. Right. With Jessica, well, she started working with him. I mean, she met him, and she wanted to continue to have a relationship with him. And at some point in their relationship, he said to her, listen, you should start stripping. You should do some prostitution dates. And she had a choice, and she identified that, and she said, well, I really wanted to stay with him. I was in love with him. And so I thought, well, if it's good for us, then I guess I'll do it, even if I kind of feel bad doing it. That's a choice. That may be a very difficult choice, but it doesn't negate the voluntary nature of the choice. Mr. Henderson, this statute, unlike the statute in Boyd, clearly does invoke the Congress power. Doesn't that make a difference in the probable scope of Congress's intent? I don't think so. Again, we're not attacking the constitutionality of this. No, but that is indicative of their intent. They were apparently trying to prescribe something that, in the Congress's judgment, affected interstate commerce. Right. No, that's true. It's certainly a difference. I mean, Bond didn't reach the issue of the constitutionality. And what it reached, I think, was saying the rule from Bond is when Congress intrudes on what is traditionally a state criminal matter, we need a clear indication that that's what it intended to reach. So Congress invoking the commerce power, I think, really is just a source of jurisdiction. I don't think it's saying we want to affect all prostitution. And one of the reasons I think that is because there was a bill in the House in 2007 that did seek to basically federalize criminal prosecution of prostitution, and it failed, with the Department of Justice rallying against it. So the introduction of that bill tells me two things. One is that this statute clearly was not seen as sufficient by Congress to attack all prostitution, all commercial sex acts. And it also means that we don't have that law. This is not a prostitution statute. This is a sex trafficking against the will of the victims statute. The case that I think applies Bond best to a similar set of facts is the Sixth Circuit's case in Toby Ave, where it's under Section 1589, the forced labor statute, which was enacted at the same time. And what the Sixth Circuit says is, yeah, we've got reprehensible conduct here. We've got child abuse. We've got forcing children to do a lot of work. But it's not forced labor. There's a difference in quality between the type of statute and the penalties associated with that statute that Congress enacted, and the local criminal activity that's happening here. But the range of this activity was not. It affected Wisconsin and Minnesota, and it used Craigslist, which is pretty widespread. Right. So it isn't just a local, whatever the city was. Right. Now, the majority of the dates were done locally in terms of. . . Right, they were. Right. But they did spread quite a wide. . . Right. And again, there's no question that Congress has the power to regulate this. Why wouldn't your argument apply to the Mann Act? Well, because I think there Congress gave a clear indication that we are seeking to criminalize this. It's whether there's a clear indication that Congress is seeking to criminalize a certain range of conduct. And so, right, with distribution of drugs, that happens at the local level every day. But Congress has clearly indicated. . . And what's the difference in language between this and the Mann Act? Well, I'm not sure about that. I'd have to look that up. Well, I don't understand you. What's the difference between this law and the Mann Act? My assumption about the Mann Act is that within the Mann Act and looking at. . . If you look at the congressional record, Congress clearly intends to criminalize what is local conduct. It's the clear indication that I'm looking for in this record that I don't see. And the Supreme Court has just said we need that clear indication. You're being awfully vague about it. Right, and I apologize for that. I don't know what the record is in the Mann Act. I'd have to look that up. I think the Supreme Court really is taking the federalization of criminal law very seriously. All this is about is applying standard criminal principles about prostitution to situations in which the prostitute is transported across state lines. No, I don't think that's true. I think that's the Mann. . . I mean, that's Section 2422. So what's the difference here? The difference here, this deals with forced prostitution. Well, this is your notion of cause as force? And that's the notion. Yeah, but that's not persuasive. That's not what cause means. Cause doesn't mean exert force. Cause means bring about a result. Right, and so in the statute it's not. . . Okay. That's cause. Right. It's not force. Right, and again. . . So why is the cause here? Why do you equate cause to force? Well, I actually don't equate it to force. I may have misspoke. I equate it to voluntariness. Because if cause implies an external actor or some sort of effect. And so, presumably, just engaging in a commercial sex act by a prostitute. . . Nobody's causing the prostitute to engage in the commercial sex act. I mean, I suppose, you know, you show up at the date. . . I don't understand that. You hire a person to be a prostitute. You're causing her to be a prostitute. Right, and the difficulty I see with that interpretation. . . I understand it. But is that it basically makes a federal crime out of all prostitution. Well, that's what the Mann Act does. Right, and in this case. . . You haven't told me what the difference is between this and the Mann Act. No, and that's due to my ignorance. I simply don't have the distinction. . . Well, that's rather critical. Yeah. Because no one is questioning the constitutionality of the Mann Act. Right, right. And we're not challenging the constitutionality of the Mann Act. Yes, I know. But you think it's unconstitutional or unintended or something. That there's no requirement of force. But there's no requirement of force in the Mann Act. Right. So I don't know what the difference is. Right. Well, I would just say. . . Our argument is not that there. . . Our argument is that this addresses involuntary prostitution. That's what Congress intended. And I think that the court should read the statutory language to affect Congress's intent. But that's my reading of Congress's intent. I want to briefly talk about the ex post facto violation here. The main count that really drove the guidelines was based on conduct that was retroactively increased in punishment. And this court has upheld the one-book rule in cases where offenses are grouped. But this is very similar to the Fletcher case that just came out when we have ungrouped counts. So I guess unless the court has questions, I'll rest on my briefs. But I think that there is a serious problem with using enhanced guidelines on counts that finish before the guidelines were amended to drive what became a 30-year sentence. How do the circuits line up on that issue right now? Well, I think we say it in our brief. I think it's either the First or Second Circuit has said, yeah, the one-book rule is fine in accordance with this court's statements in Hallahan. But, again, those have to do with grouped counts rather than ungrouped counts. And this court has always held that the grouping is what gives notice to a defendant that he may be subject to a higher penalty. Was there a Supreme Court pew versus the United States which found them retroactive? Right, exactly. So Pew says you can't apply guidelines retroactively. The question is, though, when you have conduct that straddles the line, if they're grouped, this court has said you can increase them retroactively. That was Hallahan. But if they're not grouped, Fletcher says we've got problems. We've got ex post facto problems. So I'll reserve the rest of my time. You said grouping gives notice? That's what the court has held. Well, that's ridiculous, right? What do these people know about grouping? I agree with that statement, but to the extent we're bound by precedent, that's what the court has said. But there was no grouping here. So I'll reserve the rest of my time. Okay, thank you, Mr. Henderson. Mr. Wall? Good morning. May it please the court, Mr. Henderson. To answer the court's question asked several times, the difference between this statute, 1591, sex trafficking of children, or by force, fraud, or coercion, in comparison to the... These are not children. You use that word a lot in your brief. It's the title of the statute. These are not children. Sixteen-year-olds are not children. That's true of their minors. The statute is called sex trafficking of children, or by force, fraud, or coercion. I agree with you. They're not children. Many of them are pretty mature. But that also gets to a response I want to make. First of all, going back to the Mann Act, I think the court understands what the difference is. The Mann Act is simply the transportation of one person across state lines for the purpose of prostitution or illegal sexual conduct. This statute is different, obviously. This statute has to do with the exploitation of other human beings through the breaking down of their free will. And if it's an adult, we look for something like force, fraud, or coercion, or a combination of those. And that, of course, is breaking down free will. That's getting rid of the voluntariness of the conduct, which distinguishes it from the Wisconsin statute. If we're talking about minors, whether we're talking about 12-year-olds, whom I've interviewed, 14-year-olds, 16- or 17-year-olds, we're essentially saying they don't have the ability to consent to this type of conduct. And whether we want to get into early brain development or whatever we want to get into, that, I believe, is the rationale behind this. It's my belief, in looking at the congressional record and reviewing Appellant's brief, which is, I believe, an excellent brief, that all these horrors that Congress is looking at were really the trigger that finally caused Congress to act in this area. And to wade in with this statute, which has been amended about four different times, each time making it more clear, more strict, broader, with heavier penalties. So that's really what this is about. And I think this statute is much different, much more distinct than that, which the Appellant is talking about in Boyd, where we're talking about chemical weapon, essentially just chemicals smeared on an opponent's door frame, and the prosecutor's clearly overreaching and using the chemical weapon statute. The Jones case having to do with arson, where the statute just didn't apply, was not an impact on interstate commerce. And even the Tobiavi case having to do with child abuse, again, it's another case in which the Supreme Court said the facts don't fit the statute. Here we have a plain and simple statute, and the words couldn't be any simpler. The use of the words force, fraud, both of those have their dictionary meaning. Coercion has essentially a dictionary meaning and is also defined by the statute. These are very plain and simple things. So I think Congress, whether it's through the Commerce Clause or just through the plain, simple wording of this statute, clearly meant this to apply to conduct just like Tyrone McMillian's here, where he is trafficking these young ladies in the sex trade through the use of interstate facilities, the internet, taking them across state lines for the purposes of prostitution. And it's certainly in the case of Jessica, lying to her and leading her on and selling her a dream for more than three years until she finally just wised up. And then the other three being minors, where we really don't need to prove that, but it actually did occur, although it wasn't charged that way. These could have been charged as state crimes, could they not? They could have been charged under the state statute. Minors could have been charged under a state statute, solicitation of a child for prostitution. The adult Jessica would have to have gone under the state pimping and pandering statute, which is a wholly different animal than what we're talking about here. Pimping and pandering in Wisconsin, and that statute doesn't exist anymore. It was absorbed into a new human trafficking statute earlier this year, 2014. Pimping and pandering has to do with, pimping means taking a sex worker to a customer for the purpose of a sex act. Pandering means taking a customer to a sex worker. Anyone can call them prostitutes, just call them a sex worker. I don't like using the word prostitute. That's Wisconsin, right? I don't like using the word prostitutes because I learned that they're prostituted. You want to be politically correct. No, I want to, that too, but I want to call it what it is because nine out of ten of these females has a pimp behind them who's pulling the strings and doing much more than that. So that's why I would use the word sex worker. But is this a general push to federalize what had been for years, forever, thought of as local crimes? I mean prostitution, for example. We've seen federalization of local crimes coming since the 90s, just a wave of it. And whether this is part of it or this is just a recognition that it's really going on. I mean the cultural awareness of sex trafficking, whether it's of children, of adults, and how they get into this predicament, I think it's becoming more and more and more aware. People are becoming more and more aware of it, which is a good thing. I mean it's hard to say. Part of the impetus was the horror stories of overseas people being brought in that fit this. Sure, and those are horror stories. And in my mind, that's the trigger for Congress to say, look, we need to do something. And they draft a statute that clearly applies to interstate domestic sex trafficking, which is what we have here. The ex post facto issue is an interesting one. The court has handed down several cases since the Pew case. And I look at these cases, Judge Postner stated, I was trying to write it down quickly before I walked up here, that using grouping as the core of notice is ridiculous. I would agree with that. To me, notice needs to be transaction-based. And what I mean by transaction-based is I'm talking about a continuing course of conduct that straddles the change in the guideline. I'm talking about multiple crimes that are similar in nature, that an individual continues to commit, whether they fall under the 2D1.2 grouping provisions or not. I'm talking about a continuing course of conduct in which an individual who engages in ongoing criminal conduct, almost like a one-man conspiracy, or even better, a racketeer. In this case, we could easily say Tyrone McMillan was involved in a racketeering activity from the beginning of the time he recruited Jessica and then the time he had the three, four minors until Jessica left. That's an ongoing course of identical conduct. And I don't think there's any ex post facto problem in using the amended guidelines, the post-November 1, 2007 guidelines. I don't think the idea of grouping going under a guideline to 3D1.2 answers the question. But that has to do with the conduct straddling both of them. Well, if it straddles, that's not an issue. What we have here is we have Jessica straddles, and then we've got three minors who don't straddle, and what do we do with them now? Do we stick with the one-book rule? If we do, do we go with the pre-amendment guideline, or do we go with the post-amendment guideline? And that's the dilemma this court faces. I urge the court to go with the post-amendment guideline because, again, this should be transaction-based, not dependent on how the guidelines allocate these different crimes. Rather, what's the transaction here? That, to me, is the core inquiry. And the transaction here with MacMillan is unbroken pimping and exploitation of females and putting them into the sex trade, and that's what I think should be looked at. Again, a one-man conspiracy or, even better, essentially an uncharged racketeering enterprise. I'd like to ask you a couple of questions about the conditions of supervised release, even though they're not challenged. So the judge, in his sentencing statement, mentioned four or five of these. That's all he said. Now, there is, however, in the written judgment, there are 19, there are 20 conditions of supervised release imposed. Now, where did that come from? Your Honor, I don't know where that came from, and if he didn't hand those down to Mr. MacMillan in person, I think there's a problem with those. Excuse me? I think if he did not tell Mr. MacMillan these are your conditions of supervised release, I think that we've got a problem with those. I haven't done the research on that issue, but obviously he should have been told that in open court, along with the rest of his sentence. I'm troubled also by the fact, this comes up in other cases as well, the printed form which the AO sends to everybody, it lists 13 conditions of supervised release, but the actual guidelines list 15 conditions. And I don't know, 14 and 15 are not on the printed form. There's something very peculiar about that. I would agree. Any other questions regarding these issues? Thank you for your time. Okay, thank you, Mr. Ball. Mr. Henderson? I was surprised you didn't challenge the conditions of supervised release, because according to the printed sentence, the judgment, he's subjected to 20 conditions of supervised release, which come into force when he's 60 or so. In addition, of course, he'll be a registered sex offender with all that stuff. So why should he, after a 30-year sentence, be subjected to 20 conditions of supervised release on top of all the, you know, sex offender registration requirements? He's not also, you know, this is not a case where, so far as it appears, it's not a case about pedophilia or anything like that. How likely is he? He's not going to go back into the prostitution business at the age of 60, is he? I mean, I don't get it. Right. And, you know, we didn't challenge them. We thought they were bigger fish to fry, frankly. Well, I don't understand that. You're not precluded from challenging conditions of supervised release just because they're not the only form of punishment. Right. Well, and I'll advise him, and certainly at any point a person can move under 30. I understand, to modify. To modify them. I think with the benefit of 30 years of case law interpreting these conditions, it may be an easy modification, I guess is what I'd say. They weren't really our concern right now. Okay. I see my time's up, so I'll save my comments. Okay, well, thank you very much. And you're, of course, a public defender, and we thank you for your efforts on behalf of your clients.